# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RICHARD A. McCLOSKEY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | C.A. No. 6061-ML |
| | ) | |
| JOHN A. McCLOSKEY, personally and as | ) | |
| Executor of The Estate of Edward | ) | |
| McCloskey, THE ESTATE OF EDWARD | ) | |
| McCLOSKEY, and JOSEPHINE | ) | |
| GILLESPIE, (as beneficiary and nominal | ) | |
| Respondent), | ) | |
| | ) | |
| Respondents. | ) | |

## MEMORANDUM OPINION

Date Submitted:  June 12, 2014
Date Decided:  September 3, 2014

David J. Weidman of Sergovic, Carmean & Weidman, P.A., Georgetown, Delaware; Attorney for Petitioner.

"J" Jackson Shrum of Werb & Sullivan, Wilmington, Delaware; Attorney for Respondents.

**BOUCHARD, C.**

## I. INTRODUCTION

This action involves a claim that a decedent made an enforceable oral agreement to dispose of property after his death in a way that deviates from a facially valid written will. Given the nature of such a claim, where the testator will not be able to tell his side of the story and there is a heightened risk of fabricated evidence, Delaware law requires that the claim be proven by clear and convincing evidence.

On April 24, 2014, after conducting a five-day trial, Master LeGrow issued a well-reasoned final report in which she concluded that petitioner Richard A. McCloskey had proven by clear and convincing evidence that his father promised to leave him a home and surrounding property in Felton, Delaware upon his father's death in exchange for petitioner's commitment to pay for repairs and improvements to the property, which petitioner did over a span of forty-seven years from 1963 to 2010. The Master thus recommended that the Court enter an order requiring the father's estate to convey title to the property to the petitioner despite the existence of a later-signed will bequeathing the property in a different manner.

The Master also recommended that the Court rescind a deed the father signed in 2008 conveying part of the property to one of the respondents, John A. McCloskey, in view of the pre-existing agreement the father had made with petitioner. Separately, the Master recommended this relief because the father had been diagnosed with dementia several years earlier and lacked the capacity to transfer the property.

Respondents filed numerous exceptions to the Master's final report. Although the respondents claim their exceptions largely turn on points of law, in reality they mostly

2

challenge the application of the relevant legal standards to the evidence of record. Given the nature of the exceptions taken and the *de novo* standard of review that governs my consideration of the Master's recommendations, I reviewed the videotape and written transcript of the entire five-day trial as well as the documents admitted into evidence to make my own assessment of the record. Having done so, I independently have reached the same conclusions as the Master, overrule the respondents' exceptions and enter judgment in petitioner's favor in accordance with the Master's recommendations.

## II.  FACTUAL BACKGROUND

The Master's final report set forth a thorough recitation of the factual background of this case. I agree with that recitation and repeat it here with some modifications.

### A.  Family Background

The Decedent, Edward McCloskey ("Edward"),[1] was the father of five children. His oldest son, Richard McCloskey ("Richard"), is the petitioner in this action. His youngest son, John McCloskey ("John"), is named as a respondent in this action in his personal capacity and in his capacity as executor of Edward's estate (the "Estate"). Edward's three other children are Josephine Gillespie ("Josephine"), Ronald McCloskey ("Ronnie"), and Robert McCloskey ("Robert").

Edward was married only once, to Mary McCloskey ("Mary"), from whom he divorced in 1963. Richard and his wife, Wanda McCloskey ("Wanda"), have two

---

[1] Because most of the parties and witnesses share the same last name, I use first names for the sake of clarity and consistency. No disrespect is intended.

children: Rusty and Randy. John is married to Linda McCloskey ("Linda"). Most of the members of the McCloskey family are involved in farming in various capacities.

**B.    The Property**

The property in dispute consists of Edward's former single-family home and some farm buildings located on approximately 48 acres of land at 957 Midstate Road in Felton, Delaware (the "Property"). In 2011, the Property was appraised at $328,000 without an irrigation system and $386,000 with the irrigation system included.[2]

All of Edward and Mary's children were born in the house on the Property. In 1973, John built a home next to the Property on land given to him by Edward.

Richard married Wanda in 1959, shortly after graduating from high school, and the couple moved into a two bedroom mobile home Richard purchased. The mobile home was two to three years old and in good shape.[3] When Edward and Mary divorced in 1963, Edward remained in the Property with his elderly father, Jerry McCloskey ("Jerry"). The divorce, and the manner in which Edward ejected Mary from the Property, caused a division among the McCloskey children, with Richard taking Edward's side and the four remaining children siding with Mary.[4]

**C.    Richard Moves into the Property**

Shortly after the confrontation during which Edward kicked Mary out of the Property, Edward asked Richard and Wanda to move into the Property to help Edward

---

[2] JX 8.

[3] Trial Transcript ("Trial Tr.") 33 (Richard).

[4] *Id.* at 164-65 (Richard), 761-66 (John).

take care of the home and Edward's father, Jerry, who was 77 years old.[5] The testimony is undisputed that neither Edward nor Jerry showed an interest in performing the daily chores associated with keeping a home, including cooking, cleaning, or laundry. Jerry also required additional care as he aged.[6]

Although Richard and Wanda had a home that was in better condition than the house on the Property,[7] they agreed to move in with Edward and Jerry to provide assistance. Richard and Wanda did not pay rent, but, in addition to her full-time job, Wanda performed all the necessary domestic chores, and Richard and Wanda bought the food for the household.[8] Beginning around 1975, Richard and Wanda also paid the utilities in the home.[9]

The home on the Property was in disrepair when Richard and Wanda moved into it. Although Edward had money, he did not spend his money to maintain or improve his house. Shortly after they moved into the house, Richard and Wanda began discussing with Edward various repairs or improvements that were necessary or desirable. Richard and Wanda credibly and consistently testified that on each occasion when a significant repair or improvement was made, Edward instructed Richard and Wanda that they should

---

[5] *Id.* at 36-39 (Richard), 337-38 (Wanda).

[6] *Id.* at 339, 475 (Wanda).

[7] *Id.* at 33 (Richard).

[8] *Id.* at 40 (Richard), 338-39 (Wanda).

[9] *Id.* at 40-42 (Richard), 420 (Wanda); PX 31.

pay the associated costs because the Property would belong to Richard when Edward died.

For example, Richard testified as follows:

> Q.     Did you make any improvements to the 957 Midstate Road property after you moved in, in 1963, let's say within the first seven years?
>
> A.     Yes.  We built a patio, put on a porch, put siding on the house, and had to put a French drain into the septic system.
>
> Q.     And who paid for those improvements?
>
> A.     My wife and I.
>
> Q.     And why did you pay for those improvements?
>
> A.     Every time we wanted to do something to the property, I would always ask my father first, because it was his property.  And he would always say:  "Well, go ahead and do it.  It's all right.  And pay for it, because it's going to be yours anyway."[10]

Wanda testified similarly to Richard:

> Q.     … Did you ever hear Edward McCloskey personally promise this property at 957 Midstate Road to Richard?
>
> A.     Yes.
>
> Q.     And can you tell the Court what was discussed, and if it was more than one time, how many times you can recall that being discussed?
>
> A.     It was many times.  When we did repairs, remodeling, my husband would tell my father-in-law, "We need a new roof."

---

[10] Trial Tr. 45-46 (Richard); *see also* 58-59 (same) (referring to installation of irrigation system and grain tanks after 1963), 70-72 (same) (referring to home improvements made in the late 1970's until 1980), 100 (same) (referring to foundations installed under fuel tanks in 1997), 291-92 (same) (referring to installation of central air conditioning after 2007).

And he would say, "Well, you go ahead, put it on, pay for it, because this farm will be yours when I'm gone.[11]

Both Richard and Wanda testified they understood Edward's instructions to mean that the property would be Richard's, not that he would have a life estate in the property.[12] On two occasions in the 1960's, Wanda's brother, Chuck Holliday, overheard Edward promise Richard the property when Richard asked Edward about building a structure on the Property.[13]

Over the next ten years, Richard and Wanda paid the costs associated with closing in the front porch, adding a downstairs bathroom, replacing the roof, adding a cement patio, installing siding, replacing all the upstairs windows and installing a French drain, along with substantial electrical work and the addition of electric heat upstairs and downstairs.[14] Richard and Wanda retained many of the receipts associated with these expenses.[15] Wanda also maintained a ledger in which she contemporaneously recorded the repairs and improvements they made and the associated costs for the period from 1971 to 1997.[16] Edward did not contribute to the cost of the repairs or improvements.[17]

---

[11] *Id*. at 340 (Wanda); *see also* 479-81 (same).

[12] *Id*. at 326 (Richard), 418-19 (Wanda) (A. . . . I thought he meant, and I feel sure he meant that they would be ours, the whole kit and caboodle would be in our name, to be ours, because we fixed it up.).

[13] *Id*. at 444-45 (Holliday); *see also* 461-63 (Holliday).

[14] *Id.* at 45 (Richard), 340-48 (Wanda); PX 23-25.

[15] Trial Tr. 341-48 (Wanda); PX 24-26.

[16] Trial Tr. 341-46 (Wanda); PX 23.

7

**D.  The 1977 Will**

Edward executed his first will in 1977 (the "1977 Will").  At Edward's request, Richard made an appointment with a local attorney, who drew up the will.  The 1977 Will left the Property to Richard in fee simple absolute, devised a separate farm (the "Turner Farm") to John, and divided the residue of Edward's Estate between Ronnie, Josephine, Robert, and John.[18]  The 1977 Will named Richard and John as co-executors.  Richard was aware of the contents of the 1977 Will because he sat in on Edward's meeting with the attorney.  After the meeting, Richard informed John of the bequests Edward made in the will, particularly those involving the two farms.[19]

During this period, John worked for Richard in his various farming operations, and John generally was dissatisfied with the pay and treatment he received from Richard, particularly Richard's refusal to grant him vacation at certain times.[20]  Around 1980, John quit working for Richard.[21]

Beginning in the mid-1970s, Jerry's mental faculties began to decline significantly, and he required additional care and monitoring, which Richard and Wanda undertook.[22]  Jerry passed away in 1981.  After Jerry's death, Edward asked Richard and

---

[17] Trial Tr. 349-50 (Wanda).

[18] JX 1.

[19] Trial Tr. 65-67 (Richard), 641-43 (John).

[20] *Id.* at 622-28 (John).

[21] *Id.* at 628 (John).

[22] *Id.* at 73-74 (Richard), 351-53 (Wanda).

8

Wanda to continue living in the Property and assisting Edward.[23] Although Richard and Wanda owned a separate home, and could have moved out of the Property, they acceded to Edward's request and remained there to care for him and for the Property.[24] Wanda and Richard discussed moving, but Richard reminded Wanda "[w]e've been promised this place, and I hate to move away and lose this, what money we've got invested here."[25]

Over the next decade, Richard and Wanda continued to pay for repairs and improvements to the Property, always with Edward's permission and always with his instruction that they should bear the costs because the Property would belong to Richard when Edward died.[26] The repairs and improvements included, among other things, installing a new ceiling in the dining room, remodeling an upstairs bathroom and bedroom, installing central air upstairs, and repairing the roof.[27]

### E. The 1991 Codicil

In 1991, Edward executed a codicil to his 1977 Will (the "1991 Codicil"). The 1991 Codicil reaffirmed Edward's intention to leave the Property to Richard in fee simple, and also named Wanda, Rusty, and Randy as contingent beneficiaries of the

---

[23] *Id.* at 75-76 (Richard), 355-56 (Wanda), 646 (John).

[24] *Id.* at 75 (Richard) ("[H]e wanted us to stay there because he said he was going to need help when he got older.").

[25] *Id.* at 74.

[26] *See supra* notes 10 -11.

[27] PX 24.

bequest in the event Richard predeceased Edward.[28]  As in the 1977 Will, Edward devised the Turner Farm to John, and in the 1991 Codicil named John's wife and children as contingent beneficiaries of that bequest.  The primary revision to the 1977 Will was the removal of John as a residuary beneficiary of Edward's Estate; the 1991 Codicil provided that the residue of the Estate would be divided between Ronnie, Robert, and Josephine.  Edward did not bring Richard and Wanda with him when he made the 1991 Codicil, but he "brought it home," "showed it to [Richard and Wanda]" and said "[r]ead it and put it in the safe."[29]

In the mid-1990s, Richard and Wanda observed some changes in Edward's personality and mental acumen.  For example, he became confused at times, and on one notable occasion started a rototiller on a stone driveway.[30]  Edward also began to exhibit some resentment or hostility toward Wanda, possibly stemming from an incident in which he mistook Wanda for his wife and kissed her.[31]  The trial record included a note dated April 25, 1997 and handwritten by Edward.  In the note, Edward recorded that Wanda had yelled at him around 5:15 that evening.[32]  This note is consistent with testimony at trial describing Edward's behavior as increasingly angry and somewhat paranoid by this period of his life.

---

[28] JX 2.

[29] Trial Tr. 357 (Wanda).

[30] *Id*. at 82-83 (Richard).

[31] *Id.* at 83-84 (Richard), 366-68 (Wanda).

[32] RX 33.

Richard and Wanda, however, continued to reside with Edward and provided him care. During this period, Richard and Wanda also paid for improvements and repairs to the Property, including renovating the kitchen, installing an irrigation system and barn on the land, and installing a new roof.[33]

**F.     The 1997 Will**

Shortly after he wrote the April 25, 1997 note, Edward began discussing with John changes to Edward's will, which John memorialized in handwritten notes dated in May 1997.[34] These notes reference leaving "life time rights" in the Property to Richard, as opposed to the full disposition provided for in the 1977 Will and 1991 Codicil. Although the notes were taken by John, they strangely read in the first person as if they were written by Edward. When questioned about the notes, John appeared anxious and provided confused and nonsensical testimony concerning their preparation.

Two months later, Edward signed a will (the "1997 Will") that left Richard only a life estate in the Property, with the remainder interest passing in equal shares to Ronnie, Josephine, Robert, and John.[35] Richard's life estate included only the home and some surrounding land, but the farm land on the Property passed directly to Edward's other four children. Unlike the 1991 Codicil, which named Ronnie, Josephine, and Robert as beneficiaries of the residue of the Estate, John reappeared as a residuary beneficiary in

---

[33] PX 24.

[34] RX 38.

[35] JX 3.

11

the 1997 Will, in addition to receiving the Turner Farm.[36] The 1997 Will named John as the sole executor of Edward's Estate.

Unlike Edward's previous wills, Richard was not aware of the changes in Edward's estate plan. In fact, John and Edward actively concealed the 1997 Will from Richard. Correspondence and communications from the attorney drafting the will were directed to John's house, rather than to Edward's house.[37] John took Edward to the attorney's office and neither Edward nor John informed Richard of the changes.[38] When John asked Edward why he had reduced Richard's inheritance, Edward responded that he did not want Wanda to receive anything from his Estate.[39]

### G. John Takes Control of Edward's Funds as Edward's Health Declines

Beginning in the late 1990s, John increasingly became involved with Edward's financial and medical affairs. John had his name added to Edward's bank account, directed the bank to mail Edward's bank statements to John's home, began insisting on controlling and monitoring Edward's medications, and drove Edward to all his medical appointments.[40] John testified he was concerned about Edward's finances and believed Richard and Wanda were not properly monitoring Edward's health and his medications.

---

[36] *Id.*

[37] RX 38.

[38] Trial Tr. 872, 948 (John).

[39] *Id.* at 658-59 (John).

[40] *Id.* at 123-27 (Richard), 379 (Wanda), 683-87, 713-14, 949-50 (John).

12

Several witnesses, including Josephine's husband, credibly testified that John was extremely controlling of Edward's funds. He did not provide any money to Richard or Wanda for Edward's daily needs or care, and repeatedly refused Edward's own requests for access to his money.[41] When Edward directed the bank to send statements to the Property, rather than to John's address, John again overrode that decision and directed the bank to send the statements to John's house.[42] Edward sometimes muttered to himself "Johnny's got my money . . . Came in my bedroom and took my money out of the drawer."[43] Richard recalled Edward saying many times between 2003 and 2010 "I've got to do what Johnny says because Johnny's got my money."[44]

Between 1996 and 2001, Edward experienced at least three strokes and underwent knee surgery and prostate surgery. His health declined substantially, to the point that he no longer could sleep upstairs by 2001, had to be reminded to brush his teeth, needed assistance bathing and dressing, and generally required more extensive care.[45] He also began talking to himself regularly.[46]

---

[41] *Id.* at 450 (Holliday), 565 (Jordan), 708-09 (John); PX 32 at 22-23 (Deposition of Sam Gillespie, Josephine's husband).

[42] Trial Tr. 123-24 (Richard), 395-96 (Wanda), 949-50 (John).

[43] *Id*. at 399 (Wanda).

[44] *Id.* at 92 (Richard).

[45] *Id.* at 118-22 (Richard), 337, 501 (Wanda) 664, 685-86 (John).

[46] *Id.* at 504-05 (Wanda).

In April 2000, John and his wife, Linda, prepared a list of "grievances" that Edward purportedly had with Richard.[47] According to John's testimony, Edward sat for two or three hours without the benefit of any writings in front of him and recited various details about, among other things, cash he gave Richard for various repairs or improvements around the house, occasions on which Edward assisted Richard financially with the purchase of farm equipment, money he gave Richard or Wanda over the years toward household expenses, and instances in which Richard sold Edward's farm equipment and kept the proceeds of the sale.[48] John testified he took notes of this conversation with Edward but they were not produced in this litigation.[49]

Linda took John's notes approximately a month later and organized them into a typewritten document that Edward signed and dated (the "April 2000 Document"). John admitted he was the one who suggested that Edward sign the list of grievances. When asked why he thought it was important to do so, John testified "so the rest of the family would know down the road."[50]

By 2003, the parties agree Edward could not live alone.[51] He required substantial care and attention to his daily needs, was taking Exelon for dementia as well as

---

[47] JX 21.

[48] Trial Tr. 673-76 (John).

[49] *Id*. at 669-70 (John).

[50] *Id*. at 682-83 (John).

[51] *Id.* at 692 (John).

medication for diabetes, and began exhibiting unusual behavior, including making inappropriate sexual comments to his two young great-granddaughters.[52] John asked Edward to move in with John and Linda on several occasions, but Edward consistently refused that offer, choosing instead to remain in his home.[53] Edward never asked Richard or Wanda to leave the property.[54]

## H.    The 2003 Will

In May 2003, John contacted another attorney, purportedly at Edward's request, to again revise Edward's testamentary plan. John drove Edward to the meeting with the attorney, participated in the meeting, and specifically instructed the attorney not to send any correspondence to Edward or to call Edward at home. The intake sheet filled out by the attorney only lists John's name and address in the billing field, and includes instructions stating **"DO NOT CALL EDWARD AT HOME[.]   DO NOT SEND MAIL TO EDWARD[.]"**[55]

In June 2003, Edward signed his last will (the "2003 Will"). The 2003 Will devised the Property to John and Josephine, except that Richard was given a right to reside on the Property for one year after Edward's death. John was given the Turner Farm in fee simple, and John and Josephine were the residuary beneficiaries of the

---

[52] *Id.* at 132-35 (Richard), 506-514 (Wanda), 692 (John).

[53] *Id.* at 706 (John).

[54] *Id.* at 667-68 (John).

[55] JX 4 (emphasis in original). *See also* Trial Tr. 696 (Q: So, John, you didn't want the mail from the lawyer's office to go to the house because you didn't want Richard or Wanda to see it, correct? A. Yes.)(John).

Estate.[56] If either Josephine or John predeceased Edward, their respective share of the Estate, including their interest in the Property, was devised to Linda or her issue.[57] John was named as the sole executor of the Estate. In keeping with the instructions John gave the drafting attorney, no one informed Richard of the 2003 Will. Notably, John testified that he did not tell Richard or Wanda about the 2003 Will or its contents because he knew "[i]t would cause big conflicts between Richard, Wanda, and Ed."[58] During this period, Edward, who witnesses consistently described as frugal and someone comforted by watching his savings accumulate, gave John and Josephine $70,000 each in certificates of deposit.[59] John did not tell any of his siblings about this gift.[60]

Between 2001 and 2004, Richard's daughter-in-law, Jordan, spent several nights a week at the Property, and also was present regularly during the day while she completed her education and worked a part-time job.[61] Jordan observed Edward talking to himself and yelling to himself almost daily during this period.[62] Jordan also heard Edward and Richard discussing improvements and repairs to the Property at various times, and recalls

---

[56] JX 5.

[57] *Id.*

[58] Trial Tr. 696 (John).

[59] *Id.* at 706-07, 716-17 (John).

[60] *Id.* at 707 (John).

[61] *Id.* at 544-45, 580-81 (Jordan).

[62] *Id.* at 545-46 (Jordan).

hearing Edward telling Richard to pay for the improvements because the Property would be Richard's "anyway."[63]

During this period, the repairs and improvements to the house included installation of electric heat in the kitchen and office, painting the barn roofs, and replacing a door and damaged flooring. In 2007, Richard installed central air conditioning again on Edward's word that Richard should "[g]o ahead and do it, pay for it, because it's going to be [Richard]'s someday."[64] Wanda testified that she and her husband "certainly would not have gone ahead with all the renovations and all that we did" had she known that Richard's interest in the property may be converted to a life estate.[65]

## I.     The 2008 Deed

By November 2005, Edward had been diagnosed with Alzheimer's Dementia, and his physician opined that he was "not competent to manage his own financial and medical affairs and ha[d] not been since January 2005."[66] In a mini-mental state examination ("MMSE") administered in July 2005, Edward scored 15/30, a score indicating he had "moderate" cognitive impairment.[67] John was aware of this diagnosis. In fact, John

---

[63] *Id.* at 548-50 (Jordan), *see also* 581-83 (Jordan).

[64] *Id*. at 292 (Richard).

[65] *Id*. at 381 (Wanda).

[66] RX 40.

[67] *Id.*

testified that he asked Edward's doctor to perform a competency test and issue this letter because he did not trust Richard and Wanda.[68]

In 2006, Edward declined further after suffering a major stroke and Bell's Palsy.[69] After the stroke, Edward was incontinent, wheelchair bound, and required significant care. He continued to live in his home and Richard and Wanda provided the majority of his daily care.[70] John testified that his father's care never was neglected.[71]

Although he was aware that Edward was suffering from dementia and his doctor had opined that he was unable to handle his financial and medical affairs, John nevertheless asked a lawyer to draft a deed for Edward's signature, conveying three acres of the Property to John for no consideration (the "2008 Deed").[72] John testified Edward promised him these three acres years before, but John did not at the time have the funds to make use of the acreage, which is adjacent to John's home.[73] John did not tell the attorney who drafted the deed that Edward had been adjudged incompetent by his

---

[68] *Id.*; Trial Tr. 823 (John).

[69] Trial. Tr. 137-42 (Richard).

[70] *Id.* at 722 (John).

[71] *Id.* at 737-38 (John).

[72] *Id.* at 729-33 (John); PX 28. Testimony also indicated that the paperwork from the attorney reflected "[n]o dementia diagnosis." Trial Tr. 904 (John).

[73] PX 28-29; Trial Tr. 730 (John).

physician.[74]  He instead instructed his father to sign the deed, and did not tell any of his siblings about the transfer.[75]

### J.    Edward's Death and the Fallout

At some point between 2007 and 2010, Edward gave John a handwritten note that appeared to instruct John to obtain a copy of the 1977 Will.[76]  The note further stated "Check to Leave House to Richard."[77]  John conceded that this notation was indicative of Edward's intent to leave the Property to Richard.[78]  John apparently took no action with respect to the note and did not show it to Richard until discovery was conducted in this case.[79]

Edward's decline continued in the waning years of his life, and he passed away on September 1, 2010.  After Edward's death, John mailed a copy of the 2003 Will to Richard, who was shocked by its contents.

---

[74] Trial Tr. 732-33 (John).

[75] *Id.* at 731-33 (John).

[76] *Id.* at 749-50 (John); PX 30.

[77] PX 30.

[78] Trial Tr. 750-51 (John).

[79] *Id.* at 751-52 (John).

19

## III.    PROCEDURAL BACKGROUND

On December 10, 2010, Richard filed this action against John, Josephine,[80] and the Estate. On February 17, 2011, Richard filed an amended petition seeking rescission of the 2008 Deed and specific performance of Edward's promise to leave Richard the Property.[81] The amended petition contained a number of other counts, including a claim that the 2003 Will was not valid because Edward lacked testamentary capacity or was unduly influenced to make the will,[82] and claims for a constructive or resulting trust over the Property.

This case was tried before Master LeGrow over five days in April and June 2013. Ten witnesses testified at trial: Richard and his wife Wanda; John and his wife Linda; Jordan (Richard and Wanda's daughter-in-law); Ronnie (Richard and John's brother), Mary Massey (Richard and John's mother); Pauline (Edward's sister); Chuck Holliday (Wanda's brother); and William Arrington (Richard and Wanda's neighbor).

On December 3, 2013, the Master issued a draft report in a bench ruling. Respondents took five exceptions to the draft report.

---

[80] Josephine did not actively participate in the litigation or contest Richard's right to specific performance of the oral agreement or any other relief.

[81] Amended Petition to Review Proof of Will, to Specifically Enforce Promise to Make a Testamentary Devise, to Impose a Constructive or Resulting Trust, and to Rescind Deeds ¶¶ 31-37, 46-51.

[82] Although the Amended Petition referred only to the 2003 Will, the Pre-Trial Stipulation and Order included a claim to declare the 1997 Will invalid for lack of testamentary capacity or undue influence. *See* Pre-Trial Stipulation and Order 1-2, 7, 11 (Jan. 9, 2013).

On April 24, 2014, the Master issued her final report recommending that the Court enter an order in favor of Richard (1) requiring John, as executor of the Estate, to specifically perform Edward's portion of the oral agreement by conveying title to the Property to Richard in fee simple and (2) rescinding the 2008 Deed. Having concluded that Richard was entitled to specific performance and rescission of the 2008 Deed, the Master did not reach Richard's alternative claims to invalidate the 1997 and 2003 Wills, along with his claims for a constructive trust or a resulting trust.[83]

On April 29, 2014, respondents asserted the same five exceptions to the Master's final report as they had asserted in response to her draft report.

## IV.  STANDARD OF REVIEW

The standard of review for a master's findings, both factual and legal, is *de novo*.[84] Court of Chancery Rule 144(a)(1) provides that, "[i]n all instances in which the Master's report is based upon testimony taken on the record before the Master, proceedings on any exception to the final report shall be on *that record*, unless for good cause shown the Court elects to take additional testimony."[85]

In this case, the respondents' exceptions implicate various factual findings and credibility determinations the Master made in her final report. Because the five-day trial

---

[83] *McCloskey v. McCloskey*, 2014 WL 1824712, at *10 (Del. Ch. Apr. 24, 2014).

[84] *DiGiacobbe v. Sestak,* 743 A.2d 180, 184 (Del.1999).

[85] Ct. Ch. R. 144(a)(1) (emphasis added).

before the Master was videotaped,[86] I could observe the demeanor of the witnesses and independently assess their credibility based on the same record that formed the basis for the Master's recommendations as Rule 144(a)(1) contemplates by reviewing the videotape. Having done so, in addition to reviewing the entire written transcript and the documents admitted into evidence, I do not believe good cause exists to conduct a hearing to take additional testimony.[87]

## V.   LEGAL ANALYSIS

The respondents have not challenged legal standards the Master applied to determine the existence of an oral agreement to make a will. Those standards are well-established and repeated in Section A below as they appeared in the final report. Instead, respondents take issue with the Master's application of those standards to the evidence of record. The Master's analysis and her recommendations are summarized in Section B below. Section C addresses the five exceptions taken to the Master's final report.

---

[86] The written transcript of the trial was 1,079 pages. For some unexplained reason, the videotape was missing testimony reported on approximately 64 of those pages (*i.e.*, testimony appearing on pages 610-51 and 668-89).

[87] I recognize the Supreme Court in *DiGiacobbe* stated that "a new hearing will be inevitable" to consider the testimony of those witnesses as to whom dispositive determinations of credibility are at issue. 743 A.2d at 184. *DiGiacobbe*, however, did not consider the availability of videotape to permit the Court to make credibility determinations. In my opinion, it would ill-serve the interests of justice to require additional hearings in this case to hear live testimony that should be duplicative of the testimony available on videotape. Judicial resources can be used more efficiently by allowing the trier of fact to utilize videotape, at least in the first instance, to determine on a case-by-case basis whether any further hearings are necessary. Neither of the parties, who already have expended substantial resources litigating this matter, requested additional hearings.

22

### A. The Legal Standards Governing an Oral Agreement to Make a Will

Although Delaware recognizes the validity and enforceability of an oral contract to make a will, the law views those agreements with skepticism.[88] A will executed with the formalities of the law is treated with great dignity, and the Court will not lightly deviate from the terms of such a will.[89] For that reason, a party seeking to specifically enforce an oral agreement to make a will must meet a heightened burden of proof. This Court scrutinizes such applications closely, requiring the party alleging the existence of the agreement to prove both the creation of the contract and its terms by clear and convincing evidence.[90]

To meet this standard, the evidence presented must "produce [] in the mind of the trier of fact an abiding conviction that the truth of [the] factual contentions is highly probable . . . reasonably certain, and free from serious doubt."[91] This elevated burden of proof is necessary because the testator never will be able to present his version of events, creating an increased risk for the fabrication of evidence.[92] In order to obtain the relief he seeks, Richard must establish: (1) the existence of an oral agreement, (2) the material

---

[88] *Shepherd v. Mazzetti*, 545 A.2d 621, 623 (Del. 1988); *Eaton v. Eaton*, 2005 WL 3529110, at *3 (Del. Ch. Dec. 19, 2005).

[89] *Shepherd*, 545 A.2d at 623; *Boush v. Hodges*, 1996 WL 652762, at *6 (Del. Ch. Nov. 6, 1996).

[90] *In re Maull*, 1994 WL 374302, at *3 (Del. Ch. Jun. 9, 1994); *Brown v. Wiltbank*, 2011 WL 5027057, at *5 (Del. Ch. Oct. 13, 2011).

[91] *Brown*, 2011 WL 5027057, at *6 (internal quotations omitted).

[92] *Hughes v. Frank*, 1995 WL 632018, at *2 n.2 (Del. Ch. Oct. 20, 1995).

23

terms of that agreement, (3) that he partially performed in reliance on Edward's promise, suggesting a *quid pro quo* exchange, and (4) that it would be inequitable to deny him the benefit of his bargain.[93]

In order to establish the existence of an oral agreement, Richard must prove by clear and convincing evidence each of the essential elements to a contract:

> (1) a promise on the part of one party to act or refrain from acting in a given way; (2) offered to another, in a manner in which a reasonable observer would conclude the first party intended to be bound by acceptance, in exchange for; (3) some consideration flowing to the first party or to another; (4) which is unconditionally accepted by the second party in the terms of the offer, which may include (a) a verbal act of acceptance and (b) performance of the sought after act.[94]

A promise is "a manifestation of intention to act . . . in a specific way so made as to justify . . . [an] understanding that a commitment has been made."[95]

## B. The Master's Analysis and Recommendations

Applying the above legal standards, the Master weighed the evidence and determined that Richard had established the existence of an oral agreement by clear and convincing evidence:

> The credible testimony offered by Richard, Wanda, Jordan, and Chuck Holliday consistently established Edward's repeated promise to leave the Property to Richard in exchange for Richard's commitment to pay for the repairs and improvements to the Property. Although Richard and Wanda are interested in the outcome of this case, neither Jordan nor Chuck will receive any benefit if Richard prevails, and I cannot conclude that their

---

[93] *Id.* at *3; *Brown*, 2011 WL 5027057, at *6.

[94] *Hughes*, 1995 WL 632018, at *3 (citation omitted).

[95] *Id.* at *3 n.7 (quoting *Hunter v. Diocese of Wilmington*, 1987 WL 15555, at *4 (Del. Ch. Aug. 4, 1987)) (internal quotations omitted).

familial relationship with Richard and Wanda is sufficiently strong to prompt perjury. Having had the opportunity to observe all four witnesses, I found them to be forthright, in marked contrast to the testimony offered by John.

Although their testimony alone might not amount to clear and convincing evidence of Edward's promise, the witnesses' version of events is buttressed by the direct evidence of the 1977 Will and the 1991 Codicil, both of which were contemporaneously provided to Richard. Edward's act of giving Richard copies of these testamentary documents confirmed his promise to give the Property to Richard and made it reasonable for Richard to conclude that Edward intended to be bound by his promise. It is notable that, although Edward later revoked those documents, he never informed Richard of the 1997 Will or the 2003 Will, leaving Richard unaware that Edward had retreated from his earlier promises. John also appeared to have an understanding that Edward had promised the Property to Richard, given John's questioning of Edward when he revised his plan in 1997 and John's reasoning that the 2003 Will should be hidden from Richard to avoid any problems between Edward, Richard, and Wanda.[96]

The Master next determined that Edward received consideration in exchange for his offer, that Richard unconditionally accepted the offer by performing his end of the agreement, and that Richard established the material terms of the oral agreement by clear and convincing evidence:

The evidence at trial also conclusively established that Edward received some consideration in exchange for his offer, and that Richard unconditionally accepted the offer by performing his end of the agreement. The repairs and improvements for which Richard and Wanda paid were substantial, including both necessary repairs such as a new roof, new siding, and new windows, as well as improvements that increased the functionality and livability of the home.

* * * * * *

Richard also established by clear and convincing evidence the material terms of the oral agreement. John argues that Edward's vague statements that it "all" would be Richard's when Edward passed away are

---

[96] *McCloskey*, 2014 WL 1824712, at *8 (footnotes omitted) .

25

not sufficient to establish the material terms of the agreement, because Edward may have intended that Richard receive something less than a fee simple interest in the Property. As an initial matter, Edward's use of the word "all," given its plain meaning, supports a conclusion that Edward's promise was to leave the entire Property to Richard in fee simple. To the extent that evidence falls short of clear and convincing evidence, any doubt regarding Edward's meaning is resolved by the terms of the 1977 Will and the 1991 Codicil, which were provided to Richard and gave context to Edward's repeated promise to leave it "all" to Richard. Both of those documents devised the entire Property to Richard in fee simple.[97]

In making these determinations, the Master found that, in contrast to the testimony provided by Richard, Wanda, Chuck Holliday and Jordan, John's trial testimony was not credible in many respects:

John's trial testimony was not credible on many critical points and often differed markedly from his earlier deposition testimony. For example, John initially testified at trial that Richard did not tell him in 1977 how Edward had devised the two farms, but John was forced to change his testimony when confronted with his contrary statements at his deposition. Similarly, John testified at trial that he and Edward did not discuss Edward's plans for the 1997 Will before they drove to the lawyer's office, but that testimony is contradicted by John's handwritten notes dated May 9, 1997 and May 11, 1997, in which John appeared to draft or record ideas regarding Edward's division of his assets. John's testimony regarding the meaning of these notes, particularly his contention that the "I" in these notes referred to John and not Edward, also was nonsensical and suggested a desire to elide the true nature of his involvement with the 1997 Will. John further denied at trial that he had asked his father to add John's name to Edward's bank accounts, and that he had suggested to his father how to divide the certificates of deposit Edward gave John and Josephine in 2003, but John later was forced to backtrack and acknowledge his admissions to the contrary at his deposition. Finally, John initially denied during trial ever seeing his father's safe open, but the following day testified that he saw the safe open. John claimed confusion regarding those contradictions. As a result of these, and other, inconsistencies, along with John's palpable desire

---

[97] *Id.* at *9.

26

to use this litigation to mar Richard's image, it is difficult to place much, if any, weight on John's self-serving testimony.[98]

More broadly, the Master observed that the trial of this action involved "a number of complicated and deep-seated family resentments" and that John, in particular, "viewed the case as a referendum on Richard's behavior and treatment of John over the course of many years, and an opportunity to satisfy the resentment and dislike that even John's mother acknowledged John felt toward Richard."[99]

Having independently reviewed the entire record of this case and carefully considered the demeanor of the witnesses from my review of the videotape, I agree with each of the factual and credibility determinations set forth above for the reasons explained in the Master's well-reasoned report. In my opinion, moreover, it would be inequitable to deny Richard the benefit of the bargain he struck with his father because

---

[98] *Id*. at *7 (footnotes omitted). The unreliability of John's testimony also was relevant to the Master's consideration of the April 2000 Document:

> As an initial matter, the circumstances surrounding the creation of this document make it difficult to place any weight on its content: John appears to have been the driving force behind much of the content, the document itself was drafted by John and Linda, and John proved to be an unreliable witness. Even if everything in the document were true, however, it would not change the fact that Richard and Wanda paid for the vast majority of the repairs and improvements to the house, upon Edward's instruction that they should do so because he was going to devise the house to Richard.

*Id*. at *9. John's lack of credibility and the suspiciousness of the April 2000 Document is further evident from the fact that the notes from which this document was prepared were not produced at trial even though John testified in deposition that the notes were at his home. Trial Tr. 669-70 (John).

[99] *McCloskey*, 2014 WL 1824712, at *6.

Richard dutifully performed his end of that bargain *for 47 years*, from the date he moved back to the Property in 1963 until Edward died in 2010. Accordingly, for the reasons stated in the final report and set forth below in my consideration and overruling of respondents' exceptions, I accept the Master's recommendation to enter judgment requiring the Estate to convey title to the Property to Richard.

After determining "that Edward's promise to convey the Property to Richard was legally enforceable and applied to the entire Property in fee simple," the Master recommended that the 2008 Deed be rescinded for two independent reasons: (1) "because Edward could not convey to John property that Edward contractually was bound to convey to Richard" and (2) "because Edward lacked capacity at the time he signed that deed."[100] Regarding the second reason, the Master explained as follows:

> Although the law protects a person's right to freely transfer property, the transferor must have capacity and his decision must be free from fraud and undue influence.[101] A grantor lacks capacity if, by reason of mental illness or defect, he is (a) unable to understand in a reasonable manner the nature and consequences of the transaction, or (b) he is unable to act in a reasonable manner in relation to the transaction and the other party has reason to know his condition.[102] The evidence at trial demonstrated that, by 2005, Edward's physician had opined that he was not competent to handle his own affairs. By 2008, Edward had suffered several strokes, was incontinent, and could not care for his basic needs. John offers no evidence to contradict the conclusion of Edward's doctor, which John himself procured, relying instead on vague allusions to estoppel, without the necessary analysis to support that claim. The weight of the evidence

---

[100] *Id* at *10.

[101] *Mitchell v. Reynolds*, 2009 WL 132881, at *8 (Del. Ch. Jan. 6, 2009).

[102] *Barrows v. Bowen*, 1994 WL 198724, at *4 (Del. Ch. May 10, 1994) (citing Restatement (Second) of Contracts § 15).

supports a finding that Edward lacked capacity at the time he executed the 2008 Deed, and the Deed therefore is invalid on that independent basis.[103]

Having independently reviewed the evidence of record, I agree with the Master's factual determination that Edward lacked capacity to execute the 2008 Deed and accept her recommendation to enter judgment declaring the 2008 Deed to be rescinded on this and the other ground explained in the final report.

## C. The Exceptions.

John has asserted five exceptions to the Master's final report, specifically that: (1) the evidence did not support a finding of an oral contract to make a will; (2) the finding of the Court regarding the oral contract to make a will did not comply with the Statute of Frauds at 6 *Del. C.* § 2715; (3) the alleged "oral contract" between the decedent and the petitioner was not supported by adequate consideration; (4) the alleged "oral contract" was too vague to be enforceable; and (5) the rescission of the 2008 Deed based on Edward's diminished capacity was not supported by the record. I overrule each of these exceptions for the reasons stated below.

### Exception 1: Does the evidence support the finding of an oral contract to make a will?

Respondents' first exception is not a model of clarity but appears to boil down to the argument that Richard did not provide "sufficient evidence to overcome his heavy burden to support a finding of an oral promise to make a will."[104] After discussing four

---

[103] *McCloskey*, 2014 WL 1824712, at *6 (footnotes omitted).

[104] Resp'ts' Opening Br. 22.

cases of this nature, three of which found sufficient evidence to establish an oral contract to make a will[105] and one of which did not,[106] John suggests that the evidence in this case was insufficient because "[a]ll of the testimony regarding the existence of Edward McCloskey's alleged oral promise to make a will was given through self-interested or biased witnesses."[107] This argument is a consistent theme underlying the respondents' exceptions.

As discussed above, to address the unavailability of the testator and the heightened risk of fabricated evidence, Delaware law requires that an oral agreement to dispose of property in a way that deviates from a facially valid written will must be proven by clear and convincing evidence. There is, however, no single template for what constitutes sufficient evidence to meet this standard. Each case must be decided on its own facts. Although the standard is high, in my opinion it was met in this case notwithstanding the fact that one could argue each of the four witnesses who attested to Edward's promise

---

[105] *Mazzetti v. Shepherd*, 1987 WL 9367, at *2, *4 (Del. Ch. Apr. 6, 1987) (ruling in favor of the petitioner because his "plausible account is supported by three aspects of the evidence" including testimony of disinterested witnesses, prior wills by the decedent complying with the promise, and the fact that "no witness gave persuasive evidence of the non-existence of the asserted promise"), *aff'd*, 545 A.2d 621 (Del. 1988); *Hughes*, 1995 WL 632018, at *2 ("Hughes, like the plaintiff in *Mazzetti*, put on sufficient, credible evidence" including testimony of an independent witness and a letter by the decedent); *Eaton*, 2005 WL 3529110, at *3 (finding oral agreement by father to convey real property to two sons after father's death in exchange for two sons' making of certain improvements where defendant third son conceded that the father made the offer).

[106] *Barbato v. Davidson*, 1992 WL 103045, at *4 (Del. Ch. May 14, 1992) ("Ultimately, I cannot find that the plaintiff has met her burden of proof. No clear and convincing evidence of an oral agreement exists. The only evidence of an agreement is the self-interested testimony of Ms. Barbato."), *aff'd*, 620 A.2d 856 (Del. 1992).

[107] Resp'ts' Opening Br. 20.

had a self-interest or bias.  Given the centrality of this issue to the respondents' exceptions, I feel it important to expand on this aspect of the Master's final report.

Based on my review of the videotape and written transcript, I agree with the Master that Richard and Wanda's testimony concerning the agreement with Edward was consistent and credible – indeed, I would say highly credible.  I also agree that documentary evidence in the form of the 1977 Will and 1991 Codicil, both of which were contemporaneously provided to Richard, provide powerful evidence of corroboration of their testimony as well as the testimony of Chuck Holliday and Jordan.  Where I think some elaboration is in order is on the testimony of these two witnesses and the overall factual circumstances surrounding the promise Edward made to Richard.

Chuck Holliday recounted in a factually specific and convincing manner interactions he had with Edward in the 1960's in which Edward told Richard to go forward with particular  repairs or improvements because the Property would be his:

Q. . . . Do you have any personal knowledge about Ed making any representations as to who was going to get the farm after he died?

A.     Yes.

Q.     And can you tell the Court what you know?

A.     I started working for Richard on the McCloskey farm when I was about 13 years old, until in 1970, two months after my 18th birthday, I went in the Service, and I helped them very, very little after that.
            But I can remember, I was probably, guessing, about 14 years old.  We were at the table.  It was Eddie McCloskey, Richard, Wanda, myself and might have been a couple others there working.  And Richard wanted to I think it was remodel a barn or do something physically to the farm.  And he was talking to Eddie.  And Eddie said, "Richard, go ahead and build what you want."  He said, "The farm is going to be yours

31

anyway." And with a 14-year-old boy like myself that didn't own a row to hoe, that was impressive.

And then it was either around 1968, because that's when Richard bought Johnny and I our cars, it was behind Johnny's car – Richard, Johnny was out there, and I was in back of Eddie. Richard was wanting to build a barn or something, and he was talking to Eddie, and Eddie said, "Go ahead and build it." He said, "The farm and everything is going to be yours."

And I looked at Eddie and I said, "Eddie, if Richard gets the farm, what do I get?'

He said, "You get to work on it." And we both laughed. And I will never forget that.

So there's two times that I know for a fact that it was mentioned.[108]

Chuck Holliday, who was 60 years old when he testified at trial, has no financial interest at stake in these proceedings. Although he is Wanda's brother, I do not believe this familial relationship compromised the truthfulness of his testimony. To the contrary, I found him to be completely earnest in recounting events that understandably left an impression on him at an early age and in responding to questions generally on both direct and cross examination.

Jordan also recounted in a specific and convincing manner similar interactions she had with Edward in the early 2000's when she was spending a significant amount of time at the Property:

> Q. . . . Do you recall during that time frame whether any discussion in the McCloskey home occurred about what was going to happen to that property?
>
> A. Yes.
>
> Q. Can you tell the Court what you recall?

---

[108] Trial Tr. 443-45 (Holliday); *see also* 461-63 (Holliday).

A.    I heard Ed promise the farm to Richard multiple times.  I can recall specific instances because I remember Ed sitting at the table, his green coat on, looking out the window.  We were both watching the shingles falling off the house.  Because the noise was – they had two layers of shingles on.  It was a lot of scraping.  All the shingles were falling off and you could see them falling off the porch.  We were just talking about it.

Q.    Who is "we"?

A.    Ed and I.  It was just he was saying, "Man, that's a lot of noise.  They're getting them off there, aren't they," and I said yeah.
Richard had just walked out the door and [Edward] said, you know, talking about the shingles, and he said, "I'm glad you're doing it.  It's gonna be yours anyway."
Richard walked right out the door and shut it, and Ed turned in his chair and looked at me, because I was over near the dining room.  He said, "This will be all his anyway."  Plain as day I can remember that.

Q.    Is that the only time you ever heard that?

A.    I heard it multiple times in conversation about things that needed to be done…. So any time anything needed to be done, Richard would say, "Dad, these barn roofs need to be painted."
He said, "Go ahead and do it.  It's gonna be yours anyway.["]
"Dad, you got to get a new water heater.["]
"Well, get it fixed, it's gonna be yours anyway."  I heard it all the time.[109]

Of all the witnesses who testified at trial, Jordan was the most loquacious in explaining her answers.  Although one cannot know whether Jordan may benefit financially from the outcome of this case by a future inheritance through her marriage to Richard and Wanda's son, I do not believe this potential interest warrants discounting her testimony.

---

[109] *Id.* at 548-50 (Jordan), *see also* 581-83 (Jordan). Jordan further testified that Wanda explained to her in the 2001 to 2004 period, years before Edward died and this litigation began, that Wanda felt comfortable spending money and living on the Property even though she and Richard did not own it because "Richard trusts his father, and he promised him the farm, and that's where Richard stands."  *Id*. at 550-51, 554 (Jordan).

To the contrary, given the open and voluble manner in which Jordan responded to questions, I found her to be sincere and free of guile.

In sum, four individuals, each of whom I find to be highly credible, provided consistent testimony concerning the existence of an oral agreement. I agree with the Master that the cumulative effect of this testimony, buttressed by indisputable terms of the 1977 Will and 1991 Codicil, satisfies the clear and convincing standard. Additionally, I believe the overall factual circumstances surrounding Edward's desire for Richard to move in and remain at the Property further corroborate the existence of an oral agreement.[110]

It is undisputed that neither Edward nor his father Jerry had any desire to perform daily household chores. It also is undisputed that Edward did not want to move out of the house on the Property. On several occasions, Edward declined John's invitation to move in with John and Linda because Edward wanted to remain in his home.

The record also shows that Richard did not need to live on the Property. When he moved there in 1963 in response to his father's request to assist with Jerry's care, Richard owned another home that was then in better condition than the house on the Property and, by all accounts, Richard had the financial means to move out of the Property and relocate at any time after 1963.

---

[110] *See Amstel Assocs., L.L.C. v. Brinsfield-Cavall Assocs.*, 2002 WL 1009457, at *7 (Del. Ch. May 9, 2002) (factual circumstances surrounding transaction considered as part of the evidence deemed sufficient to satisfy clear and convincing standard for contract reformation).

By holding out the promise that the Property would be Richard's after Edward died if Richard repaired and improved it, it was natural for Richard and Wanda to remain in the house on the Property to oversee its care and maintenance, particularly since Richard was farming the land on the Property. This arrangement not only relieved Edward of the burden (financial and otherwise) of maintaining the Property and afforded him the benefit of living in a nicer home, it afforded him the additional benefits of having Wanda available to perform the household chores that he and Jerry would not perform, and having both Richard and Wanda available to assist with Jerry's day-to-day care until he died in 1981, and later to assist with Edward's day-to-day care until he died in 2010.[111] In my view, Edward's desire to receive these additional benefits from Richard and Wanda reinforce the logic of him promising to leave the Property to Richard after his death in exchange for Richard's agreement to maintain and improve the Property.

### Exception 2: Did the Master's finding of an oral contract to make a will comply with the Statute of Frauds at 6 *Del. C.* § 2715?

In their second exception, respondents argue that the Master's finding of an oral promise to make a will violates the Delaware statute of frauds because "Petitioner offered no writing of any kind that would comply with the Statute of Frauds."[112] This argument

---

[111] This is not to say that John did not play a significant role in his father's medical care. He did, by taking Edward to medical appointments and interacting with his physicians, particularly in Edward's later years. This assistance is simply different from the day-to-day type of care Richard and Wanda provided for many years when Edward was on the Property.

[112] Resp'ts' Opening Br. 22-23.

ignores settled Delaware law and is plainly without merit for the reasons stated in the Master's final report:

> The Delaware Supreme Court conclusively held in *Shepherd v. Mazzetti* that clear and convincing proof of actual part performance is an exception to the statute of frauds codified in Section 2715.[113] This Court has applied that exception several times since *Shepherd* was decided.[114] As set forth above, Richard partially (in fact, completely) performed the oral agreement by paying for the repairs and improvements to the Property over the course of 40 years, as Edward instructed. There is no question in this case that actual performance occurred and, under settled precedent, this Court recognizes that performance [i]s an exception to the statute of frauds in order to prevent that statute from working an injustice.[115] Under the partial performance exception, there is no need for a petitioner to satisfy the writing requirement in Section 2715.[116]

### Exception 3: Is the alleged oral contract supported by adequate consideration?

In their third exception, respondents argue that there was not sufficient consideration to create an enforceable oral contract to make a will because any improvements Richard and Wanda made to the Property where they resided "worked to their benefit as much as Edward's."[117] To make a contract, "*some* consideration" must

---

[113] 545 A.2d 621, 622-23 (Del. 1988) (holding that the Court of Chancery "properly read into 6 *Del. C.* § 2715 the part performance exception, which our court of equity has, upon a showing of clear and convincing evidence, read into 6 *Del. C.* § 2714(a)").

[114] *See, e.g. Hughes*, 1995 WL 632018, at *4;*Eaton*, 2005 WL 3529110, at *4;.

[115] *Shepherd*, 545 A.2d at 623.

[116] *McCloskey*, 2014 WL 1824712, at *10.

[117] Resp'ts' Opening Br. 25.

flow to the offeror.[118]    The fact that one's performance of an obligation may simultaneously benefit the offeror and another person, including the performing party, does not negate that the offeror received some consideration.[119]

I agree with the Master's conclusion that Edward received sufficient consideration even though Richard, Wanda and their family also benefited from the improvements that were made to the Property for the reasons explained in the final report:

> The fact that Richard, Wanda, and their children also enjoyed the benefit of these repairs and improvements does not diminish their value to Edward. John also seeks to minimize the value of the improvements by arguing that Edward was not the driving force behind some items, such as the new kitchen that was built in 1995. Although that may largely be true for some of the improvements, John cannot credibly contend that Edward did not benefit from living in a home with a functioning roof, new windows, new siding, heat, or air-conditioning, or that he did not benefit from the addition of a downstairs bathroom, especially after he no longer was able to live upstairs. Edward benefited from having those improvements made to his home at no cost to him, particularly given Edward's frugal nature.[120]

### Exception 4: Was the oral contract too vague to be enforceable?

Respondents' fourth exception also is not a model of clarity. Respondents appear to take issue with the Master's conclusion that Richard had proven by clear and convincing evidence that Edward promised the Property to Richard in fee simple as

---

[118] *Hughes*, 1995 WL 632018, at *3 (emphasis added) (quoting *Hunter v. Diocese of Wilmington*, 1987 WL 15555, at *4 (Del. Ch. Aug. 4, 1987)).

[119] *See Shepherd*, 545 A.2d at 623 (son's agreement to continue to manage the family business provided "mutual benefit" to father and son but nonetheless served as part of consideration for father's promise to devise family home to son).

[120] *McCloskey*, 2014 WL 1824712, at *9 (footnote omitted).

37

opposed to some lesser form of ownership. The Master explained her analysis of this issue in her final report, as follows:

> John argues that Edward's vague statements that it "all" would be Richard's when Edward passed away are not sufficient to establish the material terms of the agreement, because Edward may have intended that Richard receive something less than a fee simple interest in the Property. As an initial matter, Edward's use of the word "all," given its plain meaning, supports a conclusion that Edward's promise was to leave the entire Property to Richard in fee simple. To the extent that evidence falls short of clear and convincing evidence, any doubt regarding Edward's meaning is resolved by the terms of the 1977 Will and the 1991 Codicil, which were provided to Richard and gave context to Edward's repeated promise to leave it "all" to Richard. Both of those documents devised the entire Property to Richard in fee simple.[121]

I agree with the Master's analysis set forth above. The conclusion that Edward promised to convey full ownership of the Property also is supported, in my view, by the fact that each of the four witnesses who attested to the existence of the promise testified consistently that Edward, referring to Richard, said the Property would be "yours," which naturally implies full and not some form of partial ownership.[122]

**Exception 5: Is the rescission of the 2008 Deed supported by the record?**

As discussed above, the Master recommended that the 2008 Deed should be rescinded on two alternative grounds. In their fifth exception, respondents challenge the

---

[121] *Id.* (footnote omitted).

[122] Trial Tr. 46 ("It's going to be yours anyway.") (Richard), 340 ("[T]his farm will be yours when I'm gone.") (Wanda), 444 ("The farm and everything is going to be yours.") (Holliday), 549-50 ("It's going to be yours anyway.") (Jordan).

second of these two grounds, *i.e.*, that Edward lacked the capacity to transfer the property that was the subject of the 2008 Deed at the time of transfer.[123]

Respondents "concede that the evidence presented indicate[s] that Edward was of diminished capacity by 2008, the time of the deed transfer," but nonetheless "dispute that Edward lacked sufficient capacity to transfer the subject property to John," apparently because "this proposed transfer had been discussed between John and Edward several years earlier."[124] This exception is illogical.

The relevant time frame for assessing Edward's mental capacity is when the 2008 Deed was signed. This is because, even assuming Edward had the mental capacity to convey title to the three acres in question several years earlier (which is not supported by the record in my view), Edward did not actually commit to do so until 2008 (and had no right to do so then given his pre-existing oral agreement with Richard). John, who was actively involved in Edward's medical care in this time period, concedes Edward was of diminished capacity at that time. This concession is hardly surprising since Edward's own physician had opined in November 2005 that Edward had been "diagnosed with

---

[123] *McCloskey*, 2014 WL 1824712, at *10.

[124] Resp'ts' Opening Br. 30. Respondents also argue that "if Richard believed he were already entitled to receive the three acres subject because of some purported performance to comply with an oral promise he had with his father, he would have certainly raised the issue in 2008, and not nearly three years later when he discovered that his father had left him a one-year estate in the home." *Id*. at 31. Respondents did not provide any legal analysis or discuss any evidence in making this statement and thus, in my opinion, they have not fairly taken exception to the final report based on Richard's failure to object to the 2008 Deed before this action was filed.

Alzheimers Dementia" and had not been "competent to manage his own financial and medical affairs . . . since January 2005."[125]

For these reasons, I agree with the Master's conclusion that the weight of the evidence supports a finding that Edward lacked capacity when he executed the 2008 Deed and thus that the 2008 Deed is invalid on that independent basis.

## IV. CONCLUSION

For the foregoing reasons, I overrule the respondents' exceptions to the final report, accept the Master's recommendations and enter judgment (1) requiring the Estate to convey title to the Property to Richard in fee simple, and (2) declaring the 2008 Deed to be rescinded. An implementing Order and Final Judgment accompanies this Memorandum Opinion.

---

[125] RX 40.

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

RICHARD A. McCLOSKEY,                )
                                      )
        Petitioner,                   )
                                      )
    v.                                )       C.A. No. 6061-ML
                                      )
JOHN A. McCLOSKEY, personally and as  )
Executor of The Estate of Edward      )
McCloskey, THE ESTATE OF EDWARD       )
McCLOSKEY, and JOSEPHINE              )
GILLESPIE, (as beneficiary and nominal)
Respondent),                          )
                                      )
        Respondents.                  )

## ORDER AND FINAL JUDGMENT

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED this 3rd day of September, 2014, for the reasons stated in my September 3, 2014 Memorandum Opinion, that:

1.    Defined terms have the meaning set forth in the Memorandum Opinion.

2.    The Estate of Edward McCloskey is directed to convey title to the Property to Richard A. McCloskey in fee simple.

3.    The 2008 Deed is hereby rescinded and declared null and void.

_____
/ Chancellor /